# Boyd v. The State.

*Indictment for setting up, or being concerned in setting up or carrying on a Lottery.*

1. *"Tuskaloosa Scientific and Art Association," charter of; does not authorize lottery.*—The charter of the "Tuskaloosa Scientific and Art Association," &c., approved February 3d, 1866, construed, and the conclusion declared that it does not authorize a lottery on the numerical or combination plan; or on any other plan where money or its equivalent is offered or distributed as premiums.

APPEAL from City Court of Mobile.
Tried before Hon. O. J. SEMMES.

The appellant, Boyd, was indicted and convicted under section 4445 of the Code, for setting up or being concerned in setting up or carrying on a lottery, &c.

On the trial, a bill of exceptions was reserved, which sets forth all the evidence. The evidence on the part of the State tended to show that "an association known as the 'Tuskaloosa Scientific and Art Association,' had its office in the city and county of Mobile, and that within twelve months next preceding the finding of the indictment, said association disposed of certificates of subscription in Mobile county, and proceeded to distribute awards in the following manner, amongst the holders of said certificates." These certificates were of four kinds, being sold respectively for

[Boyd v. The State.]

ten, twenty-five and fifty cents. The ten cent certificates were in the following form :

> "            Fractional Certificate of Subscription
> A.                          to the                          A.
>            Tuskaloosa Scientific and Art Association,
>            Incorporated by the Legislature of Alabama,
>                          Feb'y 3d, 1866.
> Certificate ——,          Number ——,          Class ——.
> Amount subscribed 10 cents. Value of Award 50 cents.

The holder of this Fractional Certificate of subscription, if the number it bears corresponds with any of those cast by lot in this class, is thereby entitled to any one of the following awards, as set forth and published, with their value annexed, to-wit:

A photograph of a distinguished person, of the value of 50 cents.

A photograph illustration of Gustave Dore, of the value of 40 cents.

A coupon of the U. S. four per cent. bonds, of the value of 50 cents.

A copy of Davies' Arithmetic, of the value of 50 cents.

No commutation of money allowed, unless exacted in strict accordance with section 7 of the charter, and the holder of this certificate must designate the particular award he selects, which award may be delivered him by the agent in kind, or by an order on the Central office.

>                          W. W. BOYD, Jr., Treasurer.
> Series 1878.     Recorded in presence of subscriber by
>                          ————————, Agent."

The other certificates were similar to the above, the awards consisting of chromos, sets of china, bound copies of Scientific American, and coupons, gold watches, and books on scientific subjects. The bill of exceptions recites that, "any person may obtain certificates of subscription on paying therefor according to the rate fixed for each class and selecting the number or numbers which such certificate is to bear—from 1 to 78; that, at certain stated times, due notice of which is given by public advertisements, there is a distribution of awards amongst the holders of certificates, consisting of such articles in kind as may be allotted by chance or lot to any of the certificates of subscription disposed of by the association and designated in advance by the holders of said certificates; that the said distribution of awards is conducted as follows: 78 numbers printed on slips of paper are

[Boyd v. The State.]

severally encased in tubes, concealing the number they bear; these are put in a wheel and, after some revolutions, a blind-folded person takes a number out, passes it to some other person who reads it aloud and records it; then, other num-bers are severally taken out—eleven or twelve in all—and opened and read in the same manner. And any certificate which bears any number or numbers corresponding with any of those drawn by lot or chance as before described, becomes entitled to the award set forth on said certificate, as desig-nated in advance by the holder, out of those contained in the published list; and if none of the numbers of a certificate corresponds with those cast by lot, then the said certificate receives no award. The State further introduced evidence to show that a large majority of the holders of certificates selected in advance awards consisting of unmatured bonds and unmatured coupons of the United States' debt; that only a few comparatively, say—one hundered or more—se-lected pictures, illustrations, books or other useful or orna-mental articles in kind; but that *no money* was paid out as awards by the association in any case; that the bonds or coupons, when distributed, were handed to the persons enti-tled to them in a small envelope, and that they consisted invariably of unmatured public obligations; that these, however, could be disposed of by the holder as he chose, and that brokers and banks are always ready to buy them; and the State showed that several persons had bought those bonds and coupons, when offered for sale; it was further shown that many persons had been allowed awards at those distributions, and that on no occasion had it occurred that none of the articles advertised for distribution had been awarded; it was also shown that there were sometimes two and sometimes three distributions of awards daily. It was also shown that the defendant was a stockholder of the association for some shares of the value stated in the char-ter of incorporation, and that he was one of the charter officers of said corporation, to-wit: its treasurer."

The defendant's evidence tended to show that, whatever was done as above stated, in and about the said distribution of awards amongst the holders of certificates, was done under the following charter of incorporation, entitled "An act to incorporate the Tuskaloosa Scientific and Art Association for the purpose of encouraging science and art, and in aiding the University in replacing its library, and establishing a scientific museum," approved February 3d, 1866.

"Section 1. Be it enacted by the Senate and House of

Representatives of the State of Alabama in General Assembly convened, that Hampton S. Whitfield and William H. Fowler, and their associates and successors, be and they are hereby created a body corporate of the name and style of the Tuscaloosa Scientific and Art Association, for the purpose of the encouragement of art and science in the distribution of works of art, and to aid the University of Alabama in replacing its library and establishing a scientific museum.

"Sec. 2. Be it further enacted, that the said corporation shall have the power to purchase and hold, sell, transfer and confer such real and personal property as may be necessary for its purposes, to make contracts, and to sue and be sued in any court of law or equity in the State, by its corperate name, and may have and use a common seal, which can be altered or abolished at pleasure.

"Sec. 3. Be it further enacted, that the capital stock of said corporation shall be ten thousand dollars, and may be increased to fifty thousand dollars if the business of the corporation shall justify such increase, and the same shall be divided into shares of one hundred dollars, to be called in at such times and in such amounts as the corporation may upon due notice give and direct, and may be transferred by assignment on the books of the corporation; and each share shall entitle the owner thereof to one vote in the business direction of the corporation, in person or by proxy, in accordance with the by-laws of said corporation, and each stockholder shall be individually liable to the creditors and beneficiaries of said corporation to the extent of his or her stock.

"Sec. 4. Be it further enacted, that the books of subscription to the capital stock of said corporation shall be opened by the corporators above named at a convenient time and place, to be fixed by them after ten days notice thereof, and when the sum of ten thousand dollars is subscribed, said books may be closed, and the corporation may thereupon organize itself by the election of a president, vice-president, secretary and treasurer, who shall hold their offices for one year, and until their successors are elected; and the said officers shall constitute the board of directors of said corporation, and shall manage and control its business under such restrictions, resolutions and by-laws as the stockholders may make.

"Sec. 5. Be it further enacted, that the stockholders shall hold annual meetings at such time and place as they may determine, and may have called meetings upon due notice given by the president or three stockholders, as the by-laws

[Boyd v. The State.]

may direct, and at said annual meetings the officers of the corporation shall be elected, and a record of the proceedings of all meetings shall be kept, subject to the inspection of every stockholder; and if any stockholder shall fail to pay his stock upon call as herein provided, he may be sued for the same in any court having jurisdiction.

"Sec. 6. Be it further enacted, that the said corporation shall have the power to receive subscriptions and to sell and dispose of certificates of subscription, which shall entitle the holders thereof to any articles that may be awarded to them; and the distribution of awards shall be fairly made in public, after advertisement, by the casting of lots, or by lot, chance, or otherwise, in such manner as shall be directed by the by-laws of said corporation, and shall be made at its office at Tuscaloosa, or at any other convenient place in the State that may be selected by the corporation, and the said distribution of awards may be made at any time and as often as the corporation may deem necessary; Provided, that before any distribution is made, they shall advertise in a newspaper, or by some other method, a list of all the articles to be awarded at the distribution, and the value of each, and all in money, annexed; and the said corporation shall have the power to offer premiums or prizes, in money, to the best essays on science and art, written by citizens of Alabama, or to the most deserving works of art, executed by citizens of Alabama, or to the most useful inventions in mechanics, science or art, made by citizens of Alabama.

"Sec. 7. Be it further enacted, that the articles to be distributed or awarded may consist of books, paintings, statues, antiques, scientific instruments or apparatus, or any other property or thing that may be ornamental, valuable or useful, and, to prevent fraud or unfair speculation, any holder of a certificate, if he has cause to believe that the article or premium awarded to him is not worth the value annexed to it in the published list, may have the same appraised by two or more disinterested persons, and if it be decided by them that the article is not worth its annexed value as published, they shall appraise the same at a fair market value, and then the holder of said certificate, instead of the article in question, may demand its annexed value in money, or he may demand the article and so much money in addition thereto as will equalize its appraised value with its published value in the list; and he may enforce his right herein, if contested, by a motion after ten days notice for judgment and ten per cent. damages against the corporation in any court having jurisdiction.

[Boyd v. The State.]

" Sec. 8. Be it further enacted, that an account of the net proceeds of the business be kept in suitable books, and that a dividend of not more than fifteen per cent. of which shall be paid over to the stockholders, and the balance into the treasury of the University in annual payments, and that the board of trustees of the University shall have the power to appoint at each annual meeting a committee of three of its members to inspect the said books and report to the said meeting.

" Sec. 9. Be it further enacted, that if the said corporation shall fail to pay over to the treasurer of the University, upon demand, any money due by the provisions of the preceding clause, the board of trustees of the University may at its next ensuing term of the Circuit Court of Tuscaloosa county enter a motion after ten days notice, for judgment for the amount due and ten per cent. damages against the corporation.

" Sec. 10. Be it further enacted, that this act of incorporation shall continue and be in force for the space of twenty-five years from the date of its passage, and that all laws and parts of laws in conflict with its provisions, be *pro tanto* repealed."

The defendant further showed that the corporators of said asssociation, a short time after the approval of this act of incorporation aforesaid, organized as provided in said act by the opening of subscription books, the election of officers, and that said organization has ever since always kept up its organization down to and at the time of the acts aforesaid.

" The defendant further proved that said association, although its capital has been absorbed in losses, has, however, paid out large sums of money towards the objects of its formation, namely, exceeding eleven thousand dollars divided between the State University, the Medical College of Mobile, the State Agricultural and Industrial Fair, the public schools of Mobile, Selma, and other points, and other learned and educational institutions, the whole being for the encouragement of arts, sciences, &c., &c. The defendant further showed that, before each and any distribution of awards took place, the association caused to be published in a conspicuous manner, in various public places of the city of Mobile and in its several offices, a complete, detailed list of all the several articles of ornament, use or value, which were to be awarded to such certificates as became entitled thereto· by the casting of lots, together with the value of each, all in money annexed, and from amongst which articles the holder·

[Boyd v. The State.]

of each certificate had designated in advance the article he selected, in case his certificate should become entitled to any award in the class to which it belonged."

The defendant also introduced in evidence the rules of the association. In the view which the court took of the case, it is not material to notice these further than to say, that they were in the main directed to cautioning the agents to a strict compliance with the charter, and providing penalties for disobedience.

"The defendant further showed that the distribution of awards were fairly made, in public and after such advertisements as above described, and that said distributions were made by the *casting of lots*, or by lot, or chance, *in the manner provided by the by-laws of the association*, of which due proof was made by the production of the original minutes of the association, and that the objects distributed were either ornamental, valuable or useful, including U. S. bonds and coupons. This was all the evidence."

The court charged the jury, that "this is an indictment against the defendant, charging him with setting up or being concerned in setting up or carrying on a lottery. If you believe from the evidence, beyond a reasonable doubt, that the defendant engaged in or was concerned in selling pieces of paper with certain numbers thereon; that corresponding numbers were put into a glass wheel and a certain number of said numbers drawn from said wheel, one at a time by chance, and the person who bought the said pieces of paper got something of value or nothing, according as the numbers on his piece of paper so bought are amongst the numbers drawn from the wheel or not—and further, that the defendant gains or loses according as the number of persons winning is greater or less—then he would be guilty as charged in the indictment, and would not be protected by the act of the legislature entitled, 'An act to incorporate the Tuskaloosa Scientific and Art Association, for the purpose,' &c., provided, you further find from the evidence, beyond a reasonable doubt that it was done in Mobile county before the finding of the indictment and within twelve months thereof, in which event the form of your verdict would be," &c. The defendant duly excepted to this charge.

After the jury had been out for some time, they asked to come before the court, which was allowed, and they asked further instructions on the following question: "Was the charter of the Tuskaloosa Scientific and Art Association in full force and effect at and previous to the time when the

indictment was found? Whereupon the court, after reading the question, allowed that this was a very difficult question, but the court instructed them that the said charter was in force and effect at the time mentioned; but not for the purpose of running such a lottery as the court had described in its charge." The defendant excepted to this charge also, and then separately requested the court in writing to give the following charges:

"1. If the jury believe from the evidence that defendant was acting as the agent or manager of the Tuskaloosa Scientific and Art Association in the matters shown by the evidence, and that the plan or mode referred to in the certificate given in evidence and, as shown by the evidence, was so conducted as to entitle the holder thereof to any of the articles advertised to be awarded at the distribution under said scheme that might be awarded to it; Provided, the articles subject to distribution under the award were useful, &c., and that the distribution of awards was fairly made, in public, by the casting of lots, or by lot, chance or otherwise, in such a manner as was directed by the by-laws of the association; and, provided also, that such award was made after a list of all the articles to be awarded at the distribution had been advertised, with the value of each and all in money annexed, then, the defendant ought not to be found guilty.

"If the jury believe from the evidence that the plan or mode of carrying on its business by the Tuskaloosa Association, in the case shown by the evidence, was such that a holder of a certificate of subscription thereto or the holder of a ticket known as such certificate, had a fair chance thereby to have awarded to him, by the *casting of lots, or by lot, chance or* otherwise, in such manner as was directed by the by-laws of said association in evidence, any of the articles subject to distribution in the class designated by such certificate and of the articles mentioned in section 6 of the charter, as shown by the evidence—and that such award was fairly made, in public, after a reasonable advertisement of all the articles to be awarded at the distribution, with the value of each and all in money annexed thereto—such a scheme or mode of conducting its business was authorized by the charter—and if they further believe that the defendant conducted or managed such scheme as the agent of the association and according to its by-laws, he is not guilty.

"3. That the jury must believe beyond all reasonable doubt and to a moral certainty that the defendant set up or

[Boyd v. The State.]

was interested in setting up or carrying on an unauthorized lottery, or they must acquit; and if, under the charge of the court, they have a reasonable doubt as to whether such lottery was authorized by law or not, they must acquit."

The court refused these several charges, and the defendant separately and duly excepted.

H. St. Paul, and John Little Smith, for appellant.—The Tuskaloosa Scientific and Art Association is authorized to adopt and put in force any scheme by which the certificate holder may have a fair chance to have awarded or allotted to him by the casting of lots, or by lot, chance, or otherwise, in such manner as shall be directed by the by-laws of said association, any of the articles subject to distribution according to his certificate; provided such award or allotment be fairly made in the public after such an advertisement as is required by the sixth section of the charter, of the articles subject to distribution, by such casting of lots, or by lot, chance, or other mode mentioned, with the value of each article in money annexed.

In arriving at the meaning and intention of the legislature, certain well established rules of interpretation must be observed. The first great cardinal rule is: If the language of an act is plain, that language expresses the intention of the legislature. There is no room for conjecture.—9 Porter, 266; Potter's Dwarriss on Const. Statutes, p. 143 § 2; p. 126, § 145.

It is not admissible to resort to conjecture or surmise of intention, and then from arguments of impolicy or hardships or consequences argue up to the conjecture or surmise, away from an intention clearly expressed in language when taken in its most usual, natural and obvious sense or import. The legal rules of construction do not admit of this.—Potter's Dwarriss on Const. Statutes, &c., pages 143-4, § 9; 126, § 1; 145-6, §§ 19 and 20; 110, 117, 135, 181, 182, 192, 193, 196, 199, 203, 207; Sedg'k Stat. and Const. Law, pp. 260, 242, 243, 246. Not only the natural sense of the words must be adopted when the sense is clearly expressed, but when this is doubtful, statutes must be so construed as to give effect to every clause, and not so as to place one portion in antagonism to another.—Brooks v. Mobile School Commissioners, 31 Ala. 227.

When a power is given by a statute, by implication all is given which is necessary to the making of the power effectual.

2. When the act conferring the power under discussion

was passed, there were two existing facts which stand out prominently in the construction of the act. One of these is, that it was unlawful to carry on, or to be concerned in carrying on, a lottery or a device of a like kind, unless special authority to do so was given.

The other is, that the buildings, apparatus and library of the State of Alabama had been destroyed; the resources of the State had been crippled, and it greatly desired to replace its lost library.

The State was somewhat in a similar condition as to means, as it was in during its earliest history. It was natural it should recur to the legislation of that period, and in it, they found lotteries a most common device for the building of schools and academies.

It is apparent from the act, that the legislature intended to confer an authority on the association to cary on some sort of a device, which it would not have been lawful to carry on without such authority, and such a device is in the nature of a lottery; also that the power given was a special one, which was intended to take them, as an exception, out from such general law, and to permit the association to do some *prohibited* act; that is, to carry on some sort of an otherwise prohibited lottery, or like device.

It is manifest that the chief motive of the legislature in granting this exceptional power, was "to aid the University of the State in replacing its library and establishing a scientific museum."

The *mode* and *particular means*, by which to effect this *great purpose* of replacing the University library and museum,. are not limited, except as shown by sections six and seven. This purpose required money, and a large outlay of it. And money therefor the legislature designed to raise by the act. It expressly declares so in sections eight and nine of the act. These sections demonstrate that the legislature was earnestly intent on that purpose, and on securing the money to be raised.

A library, &c., was a necessity to the University. The declaration of the purpose to replace it shows the State's solicitude upon the subject. But the replacing of it was a matter of money, as stated, and the sooner the money could be raised upon a plan, which did not sanction an actual direct *money* lottery, the more speedily would the object be accomplished.

It is therefore natural that the legislature should have granted liberal provisions for the raising of money, and we

[Boyd v. The State.]

should not be surprised to find such in an act, which appropriates to the declared purpose, *all* the earnings of the scheme *over and above fiifteen per cent.*, and which virtually makes the corporators managers for the use of the University, at a compensation not exceeding such fifteen per cent. of the net proceeds of the business. All this is plainly seen by the sections quoted.

Section eight provides, as we have seen, that an account of the net earnings shall be kept in suitable books; that no more than *fifteen per cent.* thereof shall be paid to the stockholders; that all over that sum shall be paid annually into the treasury of the University; and the trustees of the University are authorized to appoint a committee, annually, to inspect such books, and report to the trustees.

And section nine provides, that if the association fails, on demand, to pay over any money so due, judgment therefor may be rendered in favor of said trustees against *the corporation* at the next ensuing term of the Circuit Court of Tuskaloosa county, *on ten days notice,* for the amount due *and ten per cent. damages thereon.*

And with this great object in view, and with the foregoing stringent provisions, we repeat we should be prepared to expect a very liberal grant of powers for the arrangement of a scheme which would furnish the corporation large chances for making money, wherewith to accomplish this great purpose of the act.

This scheme may not have accomplished the object that was in view; but success or failure can not be considered in determining the existence or non-existence of the motive and intention, nor the meaning of the act. Failure would only prove that the legislature was not wise in adapting its means so as to accomplish its ends. Such is often the case.

If such was the declared object, and such was the intention of the legislature, the language of the act must be interpreted so as to execute that intention, if it is susceptible of a reasonable construction consistent with such object and intention; for the construction should not place sections six and seven in antagonism to sections one, eight and nine, and to the title of the act.—*Brooks v. Mobile School Commissioners,* 31 Ala. 229; 9 Port. 266.

By the light of the intention indicated; the purpose declared, and the fact that the act under consideration is manifestly an exception to the law against lotteries in general, and confers some authority prohibited by such general law, let us enter upon the consideration of sections six and seven of the act.

The first provision of section six confers power on the corporation to receive certificates of subscription, and also to sell and dispose of them. The corporation does this. It distributes property which belongs to it. It *sells chances* in its scheme of distribution.

What does this certificate entitle the holder to? The statute answers: "To *any* article that *may* be awarded to them." Not to *some* article which *must* be distributed to them. This last reading not only substitutes the word "*must*" for the word "*may*," but it also substitutes the word "*some*" for the word "*any*," and causes the sentence of the act under consideration to be changed so as to read as stated, viz: "To *some* articles that *must* be awarded them," instead of *any* articles that *may* be awarded to them, by *chance, &c.*, or that *chance may happen to award to them.* The word *may* is not mandatory. It is not equivalent to *must.* In its ordinary sense the word *may* implies possibility.

In Webster's Dictionary, "*may*" is thus defined: "To be possible. We say a thing *may* be, or may not be; an event may happen; a thing may be done, if means are not, wanting," &c.

Even *in statutes*, when the word may is used in connection with the exercise of a power, or the performance of a duty, it is a word of permission, except when the public interests are concerned, *and the public or third persons have a claim "de jure" that the power shall be exercised.*

This exceptionable construction or meaning of *may* is not the controlling rule in *ascertaining the purpose* of the legislature *as to the conferring of a right.*

In order to determine therefore whether a right is bestowed on the holder of a certificate to have some article of those subject to distribution, we must resort to the usual rules for the interpretation of statutes and give to *may* its usual significance.—*Ex parte Banks*, 28 Ala. 35.

The definition quoted from Webster, shows that the word *may*, is one of condition or possibility, dependent upon some other event. The grammars convey the same idea of possibility.

Therefore if the act had not sedulously defined that the word may should be taken in its usual sense, implying possibility and doubt, the most obvious sense of the words in the sentence under consideration would require us to read it thus: "Such certificates shall entitle the holders thereof to any articles that may chance to be awarded to them." But

to avoid all question on the subject the next sentence so declares.

The possibility then is, that *something* may perchance be *awarded* to the holders, and of course that something *may not* be awarded to them.

It will be observed that the sentence speaks of holders, in the plural number, so that the possibilities should be put thus : That something may be awarded to the various holders, or that nothing may be awarded to them according to the result of lot or chance.

To escape from this reading then, something else must be found in the act which will prevent such a reading of the sentence. We propose to show that there is nothing else to require any qualification on this point.

But what is the meaning of this word " awarded." *Award* is usually applied to the decision of arbitrators. Now in cases of arbitration there is a question as to the existence of the asserted right on one side or the other. If the right were admitted there would be no case for arbitration. It is the decision of the arbitrators which fixes the location of the right. Until that is rendered, it is uncertain whether the asserted right will exist or not for the demandant or claimant. Besides, there can be no arbitration without parties.

The question of right to the articles subject to be awarded, and to be decided by the award, is one between the association and the certificate holders, and it is the award which decides that question ; for the word award, is not confined to designate the judgment of arbitrators ; it also means the final decision of any uncertain question, for instance : " The award of Providence, the award of posterity."

This uncertain question is whether the purchaser of any ticket shall have any article or not which is in the list for distribution. The act so declares.

It is manifest the statute does not give the holder of a certificate a certain right to have necessarily and inevitably some one or more of the objects subject to be awarded. If it did, there could be no decision by chance or lot as to whether he should have *any* of the articles in the advertised list. His right is dependent on the decision or award by lot, chance, &c. If this is true in respect to one certificate holder, then, as the positions and rights of all are the same, it is true as to all, and therefore all the articles advertised and subjected to the risk of distribution, need not necessarily be distributed. There is a fair chance for it, and that is all that the law requires. For if no one has any right to any of the articles

advertised, unless the decision by the mode prescribed be in his favor, by what process of reasoning, even if we stopped here, can it be declared, that all objects advertised and subject to distribution, must be "distributed or awarded." The commencement of section seven puts "distributed" as the synonym of "awarded." Reading it in the same manner in section six, and the act declares that the certificate shall entitle the holder to any article that *may be distributed* to them *provided* chance so decides. Not to *some* article which *must* be awarded. The list to be advertised is one of articles "*to be awarded*," that is, that may be awarded.

It has been shown that the word *may* in the sentence means possibility or chance, but the legislature seemed determined not to leave the matter in any doubt. For it declares that the decision or award must be made "by the casting of lots, or by lot, chance *or otherwise, in such manner as shall be directed by the by-laws of said corporation.*" Here is an express declaration that whether the holder gets anything or not is dependent upon lot or chance, or indeed upon any scheme the by-laws of the corporation may fix on, provided such scheme secures a fair award.

What the purchaser buys is not a right to get something, but a chance to do so.

If this is not so, the legislature was most unfortunate in the use of language. For it not only authorized the corporation to fix its scheme of distribution, or awards, but it authorized the award or allotment to be made at any place in the State "that may be selected by the corporation," and at *any time* and *as often* as *the corporation* may deem necessary.

It would be difficult to frame a grant of larger powers. Bearing the object in view the grant was natural.

It requires hard work to find any but one limitation on the scheme, and that is that the association was not authorized to draw for money directly. The work is so hard that the Supreme Court, as often as the charter has been before it, and the attorneys engaged in attacks on the charter, never before found any other limitation. Of course the only value of this consideration to the judicial mind, lies in the fact that the words employed can not very obviously in their common import present an idea of the limitation suggested in the charges of the court.

These cases are: *Marks v. The State,* 45 Ala. 40; *Broadbent v. Tuskaloosa Scientific and Art Association,* 45 Ala. 172; *Warren v. The State,* 46 Ala. 549; *State ex. rel. Murphy,*

58 Ala.   The sixth section contains a proviso which has been made the basis of limiting the remarkably larger powers referred to, and it seems, by rather a strained process of rea-soning.

The proviso is not a limitation on the plan of chance distribution, nor is it an enlargement of the certificate holders' rights, unless it be to ensure that the articles shall be fairly valued, so that the chances will not be fictitious.   It is a condition precedent to the drawings, and the provisions of section seven show that its object was as is above stated.

The charges of the court imply that the requirement which says " a list of all the articles to be awarded at the distribution " shall be advertised before any distribution is made, is equivalent to a declaration that all the articles advertised to be distributed at any one drawing must be distributed; or, " that a definite number of ascertained articles, which have been advertised, should be all distributed to the holders of certificates."

If the word " distributed " in the sentence is to be substituted for the word " awarded," then we would have the useless expression that all articles *to be distributed* must be distributed, which is a matter of course, and if the act said this there would be no field for construction.   The language of the act, however, is " a list of the articles to be *awarded* at the distribution " or drawing as indicated in the preceding part of the section, in which the scheme of distribution by awards is set forth to be of *any* articles, of the list, " that *may be awarded*" to the certificate holders, *should chance, or lot, or other manner of award favor them.*

Again, this provision follows the words "before any distribution is made."   What kind of distribution ?   Such as had been provided for.   But that was not one, of all the articles.   It was of few or many, according to the results of the scheme provided for in the preceding part of the section, which the proviso was not intended wholly to subvert; for the proviso relates to the scheme.

Section seven follows in the same spirit and speaks of articles to be distributed *or awarded,* that is according to the plan authorized.   If this is not so, why was the word awarded (that is allotted by chance) coupled with the word *distributed* by the disjunctive conjunction; or, so as to preclude all idea of an imperative distribution.   If the distribution was intended to be an imperative distribution, the word awarded ought not to have been added as was done, so as to keep up the spirit of section six.   But it is there.

[Boyd v. The State.]

Section seven declares that the object of requiring all the articles which were subject to distribution to be advertised *with the money value annexed* to each, was that there might be no imposition in the sale of chances or certificates fixed on a false valuation of the articles. This was really necessary to· insure fairness in distribution by chance; for the award by lot may be made at any place in the State, while the certificates may be sold at *every other* place in the State; so that in places remote from the drawing the published valuation would be the only means the buyer would have to judge of the value of the chance offered for sale, and of getting the equivalent of his chance when drawn.

The whole act is really in harmony in all its parts, and it requires straining to make it otherwise. Its provisions under the construction insisted on by the association are also natural when the object and purpose of the legislature is considered which manifestly believed that much money might be raised by its scheme wherewith to establish the University library.

The construction contended for by the State would so narrow the scheme as to make it useless to accomplish the declared object and purpose of the act.

It can never be sustained until judicial opinions of morality and wisdom can be substituted for the plain declarations of the legislature. Not until the line of demarcation between the powers and the functions of the legislator and the judge which has been drawn by experience and sanctioned by the wisdom of ages is broken down. Nor until the judge assumes to *make laws* by construction, to suit his peculiar notions of hardship or wrong, or public policy.—Montesquieu's Spirit of Laws, book vi. chaps. 3, 5 and 6.

H. C. TOMPKINS, Attorney-General, with whom was D. C. ANDERSON, *contra.* — 1. That the evidence conclusively shows a lottery, there can be no doubt.—See 2 Whar. Am. Crim. Law, § 2429; Chavaugh's Case, 49 Ala. 396; *Almshouse v. Art Union*, 3 Seld. 228; *Wooden v. Shotwell,* 3 N. J. 470; *U. S. v. Olney*, 1 Abbott U. S. 275; *Randle v. State*, 42 Texas, 580; *Thomas v. People*, 59 Ill. 160; *Com. v. Thacher*, 97 Mass. 583.

2. But it is·insisted that if such is the case, it is a lottery authorized by the act " To incorporate the Tuskaloosa Scientific and Art Association," &c., approved February 3d, 1866. The reply to that proposition is two-fold; first, that if the act in question authorized such a scheme as is con--

[Boyd v. The State.]

tended for, it was violative of section 2, article 4, of the constitution of 1865, then in force, which provided that "each law shall embrace but one subject, which shall be described in the title." The law under which defendant is assuming to act is entitled "An act to incorporate the Tuskaloosa Scientific and Art Association for the purpose of encouraging science and art and aiding the University of the State in replacing its library and establishing a scientific museum." Its provisions are too restricted to authorize a lottery, and so far as they attempt to do so, it is void.—40 Ala. 79 ; 48 Ala. 129 ; 52 Ala. 198 ; 53 Ala. 601.

If the act in question did authorize a lottery, and was a valid constitutional enactment, it did not authorize such a scheme as is shown to have been carried on by defendant, and for which he was indicted. Section six of the act gives to the company the authority to sell and dispose of certificates of subscription which should entitle the holders to any article that might be awarded them, and prescribed the mode of award. Section seven provides what shall be the character of the articles awarded, and after naming articles useful for extending knowledge and science, "books," articles of art, "painting," &c., and "instruments of science," provides, "or any other property or thing that may be ornamental, valuable or useful." Now what kind of property and what things? Why certainly those of like kind as the specific articles mentioned in the preceding clause of the statute, things *ejusdem generis* with them. Things of some intrinsic value, not a thing of no value except as a promise to pay, such as a United States bond, or its coupons. Their distribution would no more extend knowledge or science, nor cultivate a taste for art, than would the distribution of money. Each owes its value to legal enactment, and the only difference between the treasury-notes and the bonds being that one is made a legal tender for the payment of debts while the other is not. Each is a promise to pay a certain sum of money, and either would be valueless did not the law authorize the promise. As it has been decided by this court that the law in question did not authorize a distribution of *money* as an award, the same objection seems to apply with equal force to an award of bonds and coupons, which like the greenbacks, owe their value to the fact that they are promises to pay authorized by law.—See *Marks v. State*, 45 Ala. 38; *Murphy v. Tuskaloosa S. & A. Ass'n*, 58 Ala. 54. This construction, also, of the character of the prizes authorized to be awarded is consistent with the well

(13)

[Boyd v. The State.]

known rules of interpretation, that the general words in a statute are to be restrained by the specific things immediately preceding them, and also by the mere subject-matter of the act.   The purpose of this act was to encourage science and art; that was to be done by a distribution by award of articles useful in extending knowledge and instructing in science, in cultivating a taste for the fine arts, and in enabling parties to make practical application of the truths of science. By a distribution of such things as these they would encourage science and fine arts, and be enabled by reason of the increased profit made on the articles by the mode of disposing of them, to contribute something to the aid of the University.—*Johnson v. State,* 32 Ala. 583 ; Potter's Dwarris on Statutes, 269.

3. If the act in question did authorize a lottery, it was a lottery in which the element of chance entered only into the determination of the person to whom the prize should be awarded, and does not leave to chance the determination as to whether or not any prize shall be awarded.   The matter to be determined by lot is, who shall receive the prizes ; not what prizes shall be awarded.   The act contemplated that the prizes to be awarded at any particular drawing, should be selected beforehand and a list published, and it further contemplated that on the day set for the drawing, all of those prizes should be distributed among the subscribers, not that it should be determined by lot whether any of them should be or not.   This I think is very clear from a reading of the proviso to the 6th section, which is as follows :  " Provided, that before any distribution is made they shall advertise in a newspaper or by some other method, a list of all the articles *to be awarded* at the distribution," &c.   How " to be awarded " here can not mean that may be awarded ; to construe it as meaning a thing which is only to be possibly done, as chance may determine, is directly contrary to the natural import and meaning of the phrase.   To say of a thing that it is *to be done,* means more than mere possibility or mere power to do it; it implies necessity, obligation, duty, or requirement to do it.   This published notice would not contain a list of the articles *to be awarded,* if it was dependent upon chance whether or not any of them should be awarded, it would be a list of articles that might or might not be awarded.   We are forced to the conclusion then that the scheme authorized by the legislature was one in which on the day of distribution all of the prizes published in this list should be distributed to some one or another of the holders

of certificates, and that the only thing to be determined by chance was to which of these they should go. And this construction is strengthened by the preceding clause of the section, which in speaking of the certificates, says, "which shall entitle the holders thereof to any articles that *may be awarded to them.*" Here was a matter that must be left to chance—whether or not the holder of a particular certificate should receive a prize; and in speaking of it the legislature uses a phrase implying doubt and uncertainty, but when they come to speak of the articles set up for prizes they use the expression importing certainty. These were undoubtedly the views of the learned judge in the court below; they are the views embodied in his charge and appear to me conclusively to be the correct construction of the statute.

4. But should these views be incorrect, still there is no law authorizing defendant to carry on a lottery of any kind. The charter of the Tuskaloosa Scientific and Art Association is avoided and repealed by the latter clause of section 26, article 4 of the constitution of 1875. Nor is it any answer to this to say that the charter was a contract and could not be repealed, for as says WRIGHT, of the New York Court of Appeals, "the necessary powers of the legislature over all subjects of internal police being a part of the general grant of legislative power given by the constitution, can not be sold, given away or relinquished. Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right goverment of the State; but no one legislature can curtail the power of its successors to make such laws as they may deem proper in matters of police."—*Metropolitan Board, &c. v. Barrie,* 34 N. Y. 657; *Boyd v. Alabama,* 4 Otto, 465; *Moore v. State,* 48 Miss. 147.

If any one of the positions advanced above is correct, this judgment must be affirmed. There is no conflict in the evidence, and if any one of my views above advanced is correct, the defendant was guilty of carrying on an unauthorized lottery, in violation of the statute laws of Alabama, and the court might have charged the jury, that if they believed the evidence they must find the defendant guilty. That was the effect of the charge of the court, and though this court might conclude that the court below erred in his conclusion that the lottery was an illegal one for the reason stated in the charge, yet if they come to the conclusion that it was illegal for another reason, shown by uncontradicted evidence, then they must affirm the case, for it would be clearly, if error at all, error without injury.—1 Brick. Dig. p. 780, §§ 96–9.

[Boyd v. The State.]

STONE, J.—On the 3d of February, 1866, the act was approved by which certain named persons and their associates and successors were "created a body corporate of the name and style of the Tuskaloosa Scientificand Art Association, for the purpose of the encouragement of art and science in the distribution of works of art, and to aid the University of Alabama in replacing its library and establishing a scientific museum."—Pamph. Acts, 269. This corporation, alike in its name, and in the expressed purpose of its creation, offered strong claims to public approbation and support. A judicious distribution of works of art, is certainly giving encouragement to art and science. And after the destruction of the University with its library, the accumulation of years, every lover of learning, and of the State's highest educational institution, must have rejoiced that steps were being taken to replace its lost library, and to supply it with a scientific museum. This, too, was another important step in the encouragement of art and science. What is said above comprises the whole purpose of the act, as expressed in the caption and in the first section. There is nothing in the statute, which can be construed as enlarging this purpose; for all its other provisions relate to matters of organization and detail. Sections two, three four and five confer the power to purchase, hold, sell, transfer and convey such real and personal property as may be necessary for its purposes, to make contracts, to sue and be sued, and to have a common seal; declare the amount of capital stock, and its division into shares; provide for opening books of subscription, and for organization, and direct the holding of annual and called meetings of the stockholders. Section seven specifies the articles to be distributed and awarded, ("for the purpose of the encouragement of art and science, . . and to aid the University of Alabama in replacing its library and establishing a scientific museum.") They are as follows: "books, paintings, statues, antiques, scientific instruments or apparatus, or any other property or thing that may be ornamental, valuable, or useful." The articles here enumerated, each and all, fall within the domain of science and art, and refined æsthetics. They are all germane to the expressed purpose for which this body corporate was created. This enumeration strengthens the impression made by the caption and first section of the act, that the controlling purpose of the corporation was the encouragement of art and science, and the proffered aid to the State University. The general clause following this specific enumeration, of "any other property

or thing that may be ornamental, valuable, or useful," would be usually understood and construed as embracing, and intended to embrace things of like kind. Confirmatory of the view, that only specific articles of personal property were to be offered as awards, the statute, section six, declares, "that before any distribution is made, they [the corporate authorities,] shall advertise in a newspaper, or by some other method, a list of all the articles to be awarded at the distribution, and the value of each, and all in money annexed." Bear in mind, this requires a published list of *all* the articles awarded. And this valuation is required to show its true value, as is made manifest by the seventh section, which declares that "to prevent fraud or unfair speculation, any holder of a certificate, if he has cause to believe that the article or premium awarded to him is not worth the value annexed to it in the published list," may have the same appraised, and if found of less value, may demand the advertised value in money and refuse the article awarded, or may take the article and demand the difference between the advertised and the appraised value. This clause was inserted, not as a substantive grant of power to the corporation, but as a restriction, in the interest of the certificate-holder, on the power elsewhere granted, which the legislature thought might be abused. The wisdom of this restriction will be readily seen, when it is remembered that few persons know the true, actual value of the enumerated articles to be offered as awards.

We have shown the purpose of the incorporation of the Tuskaloosa Scientific and Art Association. It is contended for appellant that the corporation was authorized by its charter to do the precise thing, for the doing of which he, as its treasurer, was indicted and convicted. This authority is claimed under section six of the act, which declares, "that the said corporation shall have the power to receive subscriptions, and to sell and dispose of certificates of subscription, which shall entitle the holders thereof to any articles that may be awarded to them." It then provides that "the distribution of awards shall be fairly made in public, after advertisement, by the casting of lots, or by lot, chance or otherwise, in such manner as shall be directed by the by-laws of said corporation." What is meant by receiving subscriptions, and disposing of certificates of subscription? And what is meant by awarding articles to the holders of such certificates of subscription? Corporations can only exercise such powers as this, when the legislature has granted them authority to do so. They can claim nothing that is not

clearly given.—1 Brick. Dig. 403, sections 22, 23.   We re-
peat, what is meant by subscription, in the clause we are
interpreting ?   It is not a subscription to the capital stock
of the association.   That was provided for by section four of
the act, and necessarily preceded organization.   The sub-
scription authorized must mean one of three things, and,
perhaps, in its generality, is broad enough to include all
three ; that is, it means either a subscription to the purchase,
or part purchase of some of the articles the association was
authorized to distribute in awards, or a contribution of some
article of the kind mentioned to be disposed of, or a subscrip-
tion to a fund to be employed in procuring works of art for
distribution, and in replacing the library of the University,
and providing for it a scientific museum.   Clauses of the act
of incorporation make it partake somewhat of the nature of
an eleemosynary foundation, while other provisions speak
of private emolument of the stockholders, not more than fif-
teen per cent., and holds each stockholder "individually
liable to the creditors and beneficiaries of said corporation to
the extent of his or her stock."   Whether this dividend of
fifteen per cent. is to be an annual dividend, or semi-annual,
as is the rule with money corporations ; whether it is to be
declared on the stock subscribed and paid in ; or whether it
is designed to furnish a rule for the division of profits on
each adventure, the charter does not inform us.   This grave
problem is left to interpretation.   Nor does the charter, in
terms, inform us how profits were to be realized for division.
The articles were to be appraised at their true value.   Whence
the profits ?   This vital question was also left to interpreta-
tion.   If we hold that the subscription, and issue of certifi-
cates of subscription, provided for in the sixth section, mean
a subscription towards the purchase of some article to be
awarded, then, to realize a profit, it would be necessary to
sell chances—subscriptions as they are strangely called—to
an amount which, in the aggregate, will exceed the value of
the article subscribed for.   This, and this only, could furnish
a margin of profit.   If this be the plan resorted to, then,
after the requisite chances for the various articles were pur--
chased or subscribed for, it could be determined by lot or
chance to which of the subscribers to this particular article,
it should be awarded.   This could be determined by many
of the various methods employed in games of chance ; such
as dice, a single number lottery, &c.   It could not be deter-
mined by a lottery conducted on the numerical, or combina-
tion plan.   If a contribution of the second class, was made,

[Boyd v. The State.]

then the whole proceeds, less fifteen per cent., would remain for the charitable purposes of the corporation. On the other hand, if it mean a subscription to a fund, to be employed in procuring works of art for distribution, and in replacing the library of the University, and providing for it a scientific museum, as mentioned third above, then, to realize a profit, and thus accomplish the purpose of the act, it would be necessary that only a part of the sum subscribed should be invested in books, paintings, statues, antiques, scientific instruments or apparatus, or other property or thing, ornamental, valuable, or useful, to be distributed or awarded to the subscribers. Under this supposed and possible' plan, the corporation would be primarily eleemosynary, with a moderate profit to the stockholders, to compensate them for their labor. The award, or distribution of works of art, or things of taste or use, would be employed as incentives to the public spirited and generous, to increase subscription and contribution to the laudable enterprise expressed in the caption and first section of the act. Inadequate compensation, it is true ; but, nevertheless, calculated to quicken and increase contributions. Under this method, as under the other, the distribution of the awards might be determined by lot or chance ; or, awards of different values might be offered to subscribers, dependent on the amount subscribed. This would dispense with the *lot or chance*, provided for in the sixth section of the act, and furnish a field of operation for the word *otherwise*, which immediately follows them.

We have attempted above to give fair and full expression and operation to every power-granting clause in the charter of the Tuskaloosa Scientific and Art Association. We think we hazard nothing in saying a reader of the charter, unless so informed, would not perceive it contained a license for a lottery. To so hold, would be to dwarf into secondary and subordinate importance, the captivating and meritorious purpose of the act, so conspicuously shown in its caption and first section, and to make its chief operative effect to consist in a liberal, if not strained interpretation of such ambiguous phrases as, "power to receive subscriptions, and to sell and dispose of certificates of subscription . . distribution of awards fairly made in public, after advertisement, by the casting of lots, by lot or chance ;" and constitutes the restraint imposed by the statute on fradulent or excessive valuation, one of the chief powers conferred on the corporation. Nay more : it stamps the legislature by which it was enacted as the dupes of language artfully framed to conceal, rather than

[Boyd v. The State.]

to communicate ideas and purposes; or, what is worse, with a deliberate purpose to deceive the public, by conferring corporate powers in ambiguous phrase, which they were unwilling to announce in plain terms. We might extend these reflections much further. We might comment on the infelicitous, if not inapt employment of the words "power to receive subscriptions and to sell and dispose of certificates of subscription," to convey the idea of authority to sell tickets or chances in a lottery; and of the word "award" to express the idea of the prize drawn therein. We might call attention to the fact that among the charitable acts asserted to have been performed by this corporation during the twelve years of its existence, we are not informed that it has made any offer of premiums or prizes for the best essays on science or art, or, for the most deserving works of art, by citizens of Alabama. And we might rely on this grant of power, as another argument in support of our interpretation of this statute. We will not, however, extend this line of argument.

For many years prior to 1866, it had been made a penal offense to set up, or be concerned in setting up a lottery in this State. It is now prohibited by the constitution. Corporations can only exercise powers such as this, when they are clearly expressed in their charters. We find nothing in this charter which authorizes a lottery on the numerical or combination plan, or on any other plan, where money or its equivalent is offered or distributed as premiums. As we said in *Tuskaloosa Scientific and Art Association v. State ex. rel.* 58 Ala. 54, 60, "Looking into the body of the statute, we fail to find any warrant for setting up a lottery." We think, as a mere incident to the purpose of this corporation as expressed in the caption and first section of the charter, it had the power to determine the awards it would make, by lot or chance, in one of the methods we have stated above. We hold its power extended no farther. This argument ignores the question of repeal of the charter, and leads us satisfactorily to the conclusion that the Tuskaloosa Scientific and Art Association never had the authority to set up a lottery. The rulings of the City Court of Mobile are in strict accordance with these views, and its judgment is affirmed.